UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| JOACHIM PETROLINO, a single person,<br><br>        Plaintiff,<br><br>    v.<br><br>DANIEL LEONETTI AND STEVEN SKINNER,<br><br>        Defendants. | No. CV-07-0228-FVS<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW |

**THIS MATTER** came before the Court on Defendants' Motion for Judgment as a Matter of Law. (Ct. Rec. 174). Plaintiff was represented by Gary R. Stenzel. Defendants were represented by Heather C. Yakely. This order is intended to memorialize and supplement the Court's oral ruling.

At the close of Plaintiff's case, Defendants moved for judgment as a matter of law, which the Court construed as a motion under Fed. R. Civ. P. 52(c)[1] for judgment based on partial findings in a bench trial.

---

[1] Rule 52(c) provides:  If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.  The court may, however, decline to render any judgment until the close of the evidence.  A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

ORDER - 1

When deciding a motion under Rule 52(c), the Court is "not required to draw any inferences in favor of the non-moving party," as it would be required to do when deciding a motion under Rule 56. *Ritchie v. United States*, 451 F.3d 1019 (9th Cir. 2006). Instead, the Court "may make findings in accordance with its own view of the evidence." *Id*.

**FINDINGS OF FACT**[2]

The Court makes the following findings of fact:

1. Plaintiff is a German National, currently residing in Mead, Washington.

2. Spokane County is a municipal corporation duly incorporated under the laws of Washington State and the Spokane County Sheriff's Department is a political sub-division of the State of Washington.

3. Individually named Defendant, Daniel Leonetti, was at the relevant time, a Spokane County Sheriff's Department Corrections Officer.

4. Individually named Defendant, Steven Skinner, was, at the relevant time, a Spokane County Sheriff's Department Corrections Officer.

5. The individually named defendants were residents of Spokane County at all relevant times.

6. On May 1, 2004, the City of Spokane Police Department responded to Mr. Petrolino's residence on a domestic violence call.

7. Mr. Petrolino was uncooperative during part of the

---

[2] Findings of Fact Nos. 1-9 and 15-22 are set out as agreed, undisputed facts in the November 9, 2010, final pretrial order. (Ct. Rec. 168).

ORDER - 2

investigation.

8.  He was eventually arrested without incident.

9.  After the investigation, Mr. Petrolino was arrested by City of Spokane Police Officers Scott Haney and James Christiansen and transported to Spokane County Jail by Spokane Police Officer Scott Haney.

10. At the Spokane County Jail, he was brought to the sally port as is standard practice.

11. He was then transferred to corrections officers for processing, which involves the completion of paperwork.

12. Mr. Petrolino stated that he indicated to the corrections officers that he could not understand English well and needed a translator.  He additionally stated that he requested that the German embassy be contacted.

13. The defendants, Officers Leonetti and Skinner, testified they do not recall Mr. Petrolino making these assertions.  In any event, Corrections Officer Skinner stated that Mr. Petrolino was not asked to read any documentation.  Pursuant to normal practice, the booking paperwork was read to him, and Mr. Petrolino needed to only orally respond to the questions.

14. The exchange of information was taking place between Officer Skinner and Mr. Petrolino.  Officer Skinner and Officer Leonetti both said they felt that Mr. Petrolino understood.  Therefore, there was no need for the services of a translator.

15. While in booking at the Spokane County Jail, Corrections Officer Skinner provided Mr. Petrolino with a pen to sign the arrest

ORDER - 3

information sheet.

16. All inmates are required by Spokane County Jail to sign the arrest information sheet.

17. If they do not sign the sheet, the officers will sign the document refused.

18. Mr. Petrolino refused to sign his name.

19. Mr. Petrolino instead began to write, "I don't agree," on the arrest information sheet.

20. Corrections Officer Skinner took Mr. Petrolino's failure to sign the arrest information sheet as being uncooperative and came around the booking desk and attempted to take Mr. Petrolino under control to be transferred to a holding cell.

21. By the time Corrections Officer Skinner had walked around the desk to obtain control of Mr. Petrolino's arm to take him to a holding cell, Mr. Petrolino had begun walking away from him toward the lobby.

22. Due to Mr. Petrolino's behavior, the correction officers considered the pen a substantial threat and/or a weapon.

23. Officer Skinner testified that, as he came around the booking desk, he saw Mr. Petrolino raise his hand above his head with the pen not in the writing position but in a stabbing position.

24. It became apparent to Officer Skinner at this point that he needed to control Mr. Petrolino. He grabbed the left arm of Mr. Petrolino and said "drop the pen" several times.

25. Officer Leonetti testified he was 15 or 20 feet away, near the jail cells.

ORDER - 4

26. Officer Leonetti said he was standing with his back to the situation, turned around, and observed Mr. Petrolino with his right hand above Mr. Petrolino's head with the pen in a manner consistent with Officer Skinner's description.

27. Officer Leonetti came quickly to assist and/or protect a fellow officer, Officer Skinner.

28. Officer Skinner stated that he used a knee strike on the left side of Mr. Petrolino's abdomen, upper stomach area, seeking to get control of Mr. Petrolino and took him down to the floor.

29. Officer Skinner stated that he does not recall Officer Leonetti being involved in the take down, but he said he may have been. He simply does not recall as he was concentrating on Mr. Petrolino.

30. Officer Leonetti's testimony was that he attempted to control the right hand and arm of Mr. Petrolino, and Mr. Petrolino continued to resist.

31. Officer Leonetti grabbed Mr. Petrolino's right arm, used two knee strikes to the torso or abdomen area of Mr. Petrolino, and brought Mr. Petrolino to the floor.

32. On the floor, Mr. Petrolino's right arm was under his body and a struggle ensued. Mr. Petrolino's right arm was eventually brought behind his back, he was handcuffed, and he was taken to a cell.

33. The pen, which was a stiff hard material, was not recovered.

34. While it is the Court's determination that there was some language difficulty, it is also this Court's determination that Mr.

ORDER - 5

Petrolino was able to understand the basic requests being made.

35. It is the Court's belief that Mr. Petrolino probably felt the whole situation did not make any sense, that he had to be arrested because his wife had become hysterical during the domestic dispute. He believed he was treated well at the scene. However, when he got to the jail, he felt that things were not going appropriately and he became quite agitated.

36. Both Officer Skinner and Officer Leonetti had gone through training. They both had been to the State of Washington's corrections academy where they were taught the various standards and procedures in corrections. They both testified they received ongoing education that entailed at least quarterly training.

37. Both Officer Skinner and Officer Leonetti testified that the technique of using a knee strike in order to gain control of a person who was in some way not following the requests of the officer or resisting is an acceptable, trained practice.

38. The type and amount of force that was used by Officers Skinner and Leonetti was consistent with the training they had received.

**CONCLUSIONS OF LAW**

The Court makes the following conclusions of law:

1. The Fourth Amendment regulates interactions between an arrestee and law enforcement officers, including corrections officers, until such time as the arrestee appears before a judge and the judge finds the arrest was supported by probable cause. *Pierce v. Multnomah County*, 76 F.3d 1032, 1043 (9th Cir. 1996).

ORDER - 6

   2.   Given the absence of a judicial determination regarding probable cause, Mr. Petrolino was not yet a pretrial detainee.  As a result, the corrections officers' treatment of him during booking is governed by the Fourth Amendment.

   3.   Under the Fourth Amendment, the force used by a corrections officer must be objectively reasonable given the totality of the circumstances.  *See, e.g., Lolli v. County of Orange*, 351 F.3d 410, 415 (9th Cir. 2003).

   4.   Determining whether force is objectively reasonable involves a balancing of the competing interests.  *Gregory v. County of Maui*, 523 F.3d 1103, 1106 (9th Cir. 2008).  On the one hand, a reviewing court must consider the nature and magnitude of the force to which the arrestee was subjected.  *See id.*  On the other hand, a reviewing court must consider the officer's need to use force to control the arrestee. *See id.*

   5.   Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).

   6.   In assessing reasonableness, courts and fact-finders must allow for the fact an officer may have to decide whether to use force in "circumstances that are tense, uncertain, and rapidly evolving[.]" *Id.* at 397.  Depending upon the circumstances, the officer may have to make a "split-second judgment[] . . . about the amount of force that is necessary[.]"  *Id.*  In doing so, he may misjudge the threat he faces.  He may use more force than he needs to protect himself or others.  The fact he uses more force than is necessary does not mean

ORDER - 7

he has violated the Fourth Amendment. Rather, the issue is whether he acted reasonably despite making a mistaken assessment of the situation. *Illinois v. Rodriguez*, 497 U.S. 177, 185-86, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

7. "If an officer reasonably, but mistakenly, believe[s] that a suspect [i]s likely to fight back, . . . the officer . . . [is] justified in using more force than in fact [i]s needed." *Saucier v. Katz*, 533 U.S. 194, 205, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), *overruled on other grounds by Pearson v. Callahan*, ___ U.S. ___, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009).

8. Officers Skinner and Leonetti needed to use force to disarm and subdue Mr. Petrolino because:

   (a) he attempted to walk away from Officer Skinner;

   (b) he disobeyed the officers' commands;

   (c) he held a pen in a manner that posed a threat to their safety; and

   (d) he would not voluntarily surrender the pen or submit to their efforts to control him.

9. The nature and magnitude of the force that Officers Skinner and Leonetti used was objectively reasonable when viewed in light of the seriousness of the threat posed by Mr. Petrolino and the vigorous manner in which he resisted them.

10. Neither Officer Skinner nor Officer Leonetti violated the Fourth Amendment when interacting with Mr. Petrolino on or about May 2, 2004.

///

**IT IS HEREBY ORDERED:**

In accordance with Rule 52(c), Defendants' Motion for Judgment as a Matter of Law (**Ct. Rec. 174**) is **GRANTED**. This cause is **DISMISSED**.

**IT IS SO ORDERED.** The District Court Executive is hereby directed to enter this order, furnish copies to counsel, and **CLOSE THE FILE**.

**DATED** this   17th   day of November, 2010.

                             S/Fred Van Sickle
                             Fred Van Sickle
                  Senior United States District Judge

ORDER - 9